**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



Jul 12 2012, 8:56 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GARY L. GRINER**
Griner & Company
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**NICOLE M. SCHUSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| KEVIN TAYLOR, )<br><br>Appellant-Defendant, )<br><br>vs. )<br><br>STATE OF INDIANA, )<br><br>Appellee-Plaintiff. ) | No. 20A03-1112-CR-563 |

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry Shewmaker, Judge
Cause No. 20C01-0407-MR-96

**July 12, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Kevin Taylor appeals his conviction and sixty-five-year sentence for felony murder. We affirm.

**Issues**

Taylor raises four issues, which we restate as:

    I.      whether there is sufficient evidence to support the underlying robbery;

    II.     whether several witnesses' testimony was incredibly dubious and insufficient to support the felony murder conviction;

    III.    whether the manner in which the jury was instructed on felony murder amounts to fundamental error; and

    IV.    whether his sentence is inappropriate.

**Facts**

Gwendolyn Hunt was a drug dealer in Elkhart. On May 19, 2003, Taylor and Kelly Thomas asked Stacy Orue, a friend of Hunt's, to buy cocaine from Hunt instead of the person she had been buying from that day. When Orue knocked on Hunt's door using a special knock, Thomas pushed his way into Hunt's apartment. Taylor also went into the apartment and, at one point, Taylor pinned Hunt against the wall so she could not enter the main part of the apartment. Eventually, Taylor grabbed Orue's arm, and they ran from the apartment to Taylor's truck. Thomas followed them to the truck, and they left. Hunt was shot in head during the incident.

A neighbor, Andrea Micklevitz, heard the gun shot, looked out the window, and saw two men running down the alley. One of the men had a small white grocery sack in

2

his hand. Another woman, Carolyn Keeney, was walking down the street when she heard a loud noise and saw Taylor and Orue and then Thomas hurry out of Hunt's apartment building and into Taylor's truck. Keeney saw Taylor drop something rolled with rubber bands that looked like money. As Thomas jumped into the truck, his shirt came up, revealing the handle of a gun.

Hunt's upstairs neighbors also heard a loud noise, investigated, and found Hunt on the floor still breathing but making a choking noise and spitting blood. They called 911, and Hunt was taken to a hospital where she died of a gunshot wound to the head.

After Taylor, Thomas, and Orue left Hunt's apartment, they went to another apartment on Sherman Street. When they arrived, Angela Salazar, who dated Thomas, heard Taylor tell Thomas that "he shouldn't have shot her." Tr. p. 508. Taylor, Thomas, and Orue went into a bedroom, and Thomas had "a large amount" of cocaine with him. Tr. p. 418. Orue guessed that Thomas had at least an ounce, which she considered unusual. Orue gave Thomas $30, and Thomas gave her at least $150 worth of cocaine. Orue also considered this to be unusual.

Keeney was also at the Sherman Street apartment when Taylor, Thomas, and Orue arrived there with a shoe box. She saw them with a larger amount of cocaine than normal and saw them counting money. Salazar later saw Thomas with an unusual amount of money and drugs and a gun. Taylor and Orue also had drugs that night. Later that night, Taylor became upset when he saw Orue walking around wearing one of Hunt's scarves.

When police investigated Hunt's apartment, they found a dresser drawer in Hunt's bedroom open all the way and a kitchen drawer open all the way. Hunt was known to

3

keep drugs and money in these two drawers. She was also known to keep her money rolled up with rubber bands. No drugs or money was found in Hunt's apartment.

On July 24, 2004, the State charged Taylor, Thomas, and Orue with felony murder for killing Hunt while committing robbery. In 2005, the three were tried together and convicted. Taylor's conviction was affirmed on direct appeal. See Taylor v. State, No. 20A03-0507-CR-319 (Ind. Ct. App. Sept. 25, 2005). In 2006, however, a panel of this court reversed Thomas's felony murder conviction because the jury was not instructed on the elements of robbery, the underlying offense. See Thomas v. State, No. 20A03-0503-CR-138 (Ind. Ct. App. Feb. 3, 2006). After Thomas's conviction was reversed, Taylor filed a petition for post-conviction relief, which was denied. On appeal, we concluded that Taylor was denied a procedurally fair post-conviction relief hearing because of post-conviction counsel's performance, and we reversed and remanded for a new post-conviction relief hearing. See Taylor v. State, 882 N.E.2d 777 (Ind. Ct. App. 2008). Following a hearing, the post-conviction court denied Taylor's petition, and Taylor appealed again. On appeal, we reversed Taylor's conviction because of the jury instruction issue. See Taylor v. State, 922 N.E.2d 710 (Ind. Ct. App. 2010). Although our supreme court initially granted transfer, it later determined that transfer was improvidently granted and denied transfer. At some point after Thomas was retried, Orue agreed to dismiss her post-conviction relief petition in exchange for the suspension of part of her fifty-five-year sentence.

Taylor was retried in October 2011, and a jury found him guilty of felony murder. The trial court sentenced Taylor to sixty-five years. Taylor now appeals.

4

**Analysis**

*I. Sufficiency of Evidence of Robbery*

Taylor argues that there is insufficient evidence to support the underlying robbery. The standard of review for claims of insufficient evidence is well settled. We do not reweigh the evidence or judge the credibility of the witnesses, and we respect the jury's exclusive province to weigh conflicting evidence. Jackson v. State, 925 N.E.2d 369, 375 (Ind. 2010). We consider only the probative evidence and reasonable inferences supporting the verdict and affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. Id. "A verdict may be sustained based upon circumstantial evidence alone if that circumstantial evidence supports a reasonable inference of guilt." Lacey v. State, 755 N.E.2d 576, 578 (Ind. 2001).

The State charged Taylor with killing Hunt while committing robbery. See Ind. Code § 35-42-1-1(2). A person who knowingly or intentionally takes property from another person or from the presence of another person by using or threatening the use of force on any person or by putting any person in fear commits robbery, a Class C felony. I.C. § 35-42-5-1.

Taylor argues, "[t]he State presented no evidence that any property was taken from Hunt." Appellant's Br. p. 10. He contends that the State did not present any evidence that Hunt had money or drugs at her apartment immediately prior to her death. He also argues that the fact that Taylor may have been seen with a roll of money and the

5

fact that Taylor and Thomas were seen with drugs are too speculative to support the conviction because money and drugs are fungible and cannot be tied directly to Hunt.

The State produced evidence detailing Hunt's drug dealing operation through the testimony of her associate, Joshua Shaw, who testified that he learned the business of dealing cocaine from Hunt. He described the cooking and packaging process, which took place at Hunt's apartment, and explained that Hunt did not sell drugs from her apartment but instead maintained other apartments from which she sold drugs. Hunt taught Shaw to organize his money with the bills going in the same direction, facing up, and rolled with a rubber band. Shaw explained that Hunt kept drugs and money at her apartment and that, as the amount of cocaine diminished, Hunt would have more money. Shaw testified that Hunt stored her money and drugs in the dresser drawer in her bedroom and in the kitchen drawer, both of which were found open by police. Shaw testified that he had previously seen Orue in Hunt's house accessing the kitchen drawer. Evidence was also presented that no drugs or money was found in Hunt's apartment after she was shot.

This evidence of Hunt's drug operation taken with the evidence of Taylor dropping a rubber banded roll as he fled Hunt's apartment, one of the men running from Hunt's apartment with a bag in hand, Thomas having an unusual amount of cocaine and money that night, Taylor and Thomas counting money, and Orue wearing one of Hunt's scarves is more than mere speculation or conjecture that Taylor or his cohorts took Hunt's property. From this evidence, the jury could reasonably infer that Hunt was killed during the commission of a robbery. There is sufficient evidence to support the robbery underlying the felony murder conviction.

6

## II. *Incredible Dubiousity*

Taylor also argues that his conviction is based on the incredibly dubious testimony of Orue, Salazar, and Keeney. Within the narrow limits of the "incredible dubiosity" rule, we may impinge upon a jury's function to judge the credibility of a witness. Love v. State, 761 N.E.2d 806, 810 (Ind. 2002). If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, we may reverse a defendant's conviction. Id. "This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity." Id. "Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." Id.

Regarding Orue's testimony, Taylor asserts that Orue maintained her innocence until shortly before Thomas's retrial when the chief deputy prosecutor met with her in jail. After Orue testified against Thomas, the State agreed to suspend ten years of her fifty-five-year sentence in exchange for her agreeing to dismiss her petition for post-conviction relief and not pursuing a new trial. According to Taylor, Orue's testimony was coerced by a "wink and nod" agreement and her hope that she would get a deal from the State, which she ultimately did.

This is argument is unavailing. First, because the three were originally tried together and Thomas and Taylor's convictions had been reversed based on an instructional error, it is quite possible that Orue would have been successful in her post-conviction relief proceedings, which were pending when she testified against Thomas.

7

As such, the State may have had good reason to agree to the suspension of a portion of Orue's sentence to avoid having to retry her. Further, Orue repeatedly testified at Taylor's trial that she was not promised anything in exchange for her testimony against Thomas. Finally, the jury was fully aware of Orue's lies to police, her prior declarations of innocence, her testimony at Thomas's retrial, and the subsequent suspension of a portion of her sentence. It was for the jury, not us, to assess Orue's credibility in light of these events.

Taylor's also attacks Orue's, Salazar's, and Keeney's testimony because they were all addicted to and under the influence of cocaine at the time of Hunt's death and because they gave inconsistent statements or lied to police. However, the incredible dubiousity rule does not apply here because this is not a circumstance where a sole witness gave inherently improbable testimony. Further, Orue's, Salazar's, and Keeney's drug use, criminal histories, and prior inconsistent statements were presented to the jury, and the jury was free to assess their credibility accordingly. We will not interfere in the jury's role of assessing witness credibility.

### IV. Felony Murder Instruction

Taylor argues that the manner in which the jury was instructed on felony murder amounted to fundamental error. Taylor acknowledges that he did not object to this instruction. A defendant who fails to object to an instruction or fails to tender an instruction waives any challenge to that instruction on appeal. Baker v. State, 948 N.E.2d 1169, 1178 (Ind. 2011). To avoid waiver, Taylor argues that the felony murder instruction resulted in fundamental error. See id. ("The fundamental error doctrine

8

provides a vehicle for the review of error not properly preserved for appeal."). "In order to be fundamental, the error must represent a blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the defendant of fundamental due process." Id. The error must be so prejudicial to the defendant's rights that it makes a fair trial impossible. Id.

The jury was instructed:

> The crime of felony murder as alleged in the information is defined by statute as follows:
>
>> A person who
>> kills another human being while committing or attempting to commit . . . robbery . . . commits felony murder.
>
> The underlying offense of robbery, as alleged in the Information, is defined by statute as follows:
>
>> A person who knowingly . . . takes property from another person or from the presence of another person:
>> (1)     by using or threatening the use of force on any person; or
>> (2)     by putting any person in fear; commits robbery . . .
>
> To convict the Defendant of felony murder, the State must prove the following elements beyond a reasonable doubt:
>> The Defendant:
>> 1.     knowingly
>> 2.     took or attempted to take property from another person or from the presence of another person;
>> 3.     by using or threatening the use of force on any person or by putting any person in fear; and
>> 4.     while doing so, another human being was killed.
>
> If the State fails to prove any of these elements beyond a reasonable doubt, you should find the Defendant not guilty.

9

> If the State did prove each of these elements beyond a
> reasonable doubt, you may find the Defendant guilty of
> felony murder.

App. p. 65 (ellipses in original). The trial court did not instruct the jury on attempt. Taylor argues that, based on the lack of evidence regarding the actual taking of property, the jury could have determined that it could return a guilty verdict even if no property was actually taken from Hunt. According to Taylor, the jury was left to fend for itself and make up its own rules regarding what constituted an attempt.

We do not believe that any error in the manner in which the jury was instructed made a fair trial impossible so as to rise to the level of fundamental error. Taylor was not charged with attempted robbery and the State did not argue to the jury that Hunt was killed during an attempted robbery. The State's theory of the case was that Thomas, Taylor, and Orue robbed Hunt, taking cocaine and money from her, and the evidence supports this theory. Because the State did not proceed on a theory of attempted robbery, Taylor has not established that the failure to instruct the jury on the elements of attempt was fundamental error.

## V. Sentence

Taylor argues that his sixty-five-year sentence is inappropriate. Indiana Appellate Rule 7(B) permits us to revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. Although Rule 7(B) does not require us to be "extremely" deferential to a trial court's sentencing decision, we still

10

must give due consideration to that decision. Rutherford v. State, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. Id. "Additionally, a defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate." Id.

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." Id. Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case. Id. at 1224. When reviewing the appropriateness of a sentence under Rule 7(B), we may consider all aspects of the penal consequences imposed by the trial court in sentencing the defendant, including whether a portion of the sentence was suspended. Davidson v. State, 926 N.E.2d 1023, 1025 (Ind. 2010).

Taylor argues that his maximum sentence is inappropriate because he was not the shooter and is not the worst offender. Although our supreme court has observed that the maximum possible sentence is generally most appropriate for the worst offenders, it has also explained that it is not a guideline to determine whether a worse offender could be imagined. Buchanan v. State, 767 N.E.2d 967, 973 (Ind. 2002).

11

Although the evidence indicates that Thomas, not Taylor, was the shooter, Taylor was actively involved in the commission of the offense. It was Taylor who suggested that Orue, Hunt's friend, buy cocaine from Hunt that day. During the ordeal, Taylor entered Hunt's apartment and at one point pinned Hunt against the wall to keep her from going further into the apartment. During the robbery, Hunt was shot in the head at close range. Taylor then drove Orue and Thomas from the scene in his truck and was seen with money and drugs after the shooting. Nothing about the nature of the offense warrants a reduction of Taylor's sentence.

Regarding Taylor's character, he has had constant contact with law enforcement since 1981. He has at least three misdemeanor convictions and felony convictions for possession of cocaine and robbery and was on probation at the time of this offense. His felony criminal history is closely related to this offense and does not bode well for his character. Although Taylor completed a drug addiction program while incarcerated and has earned college credits, we do not believe that these accomplishments render his sentence inappropriate.[1] Taylor has not established that his sixty-five-year sentence is inappropriate.

**Conclusion**

There is sufficient evidence that Taylor and/or his cohorts took property from Hunt. The incredible dubiousity rule does not apply to Orue's, Salazar's, and Kenney's

---

[1] To the extent Taylor argues the trial court failed to recognize his drug addiction as a mitigator, the trial court expressly found his addiction issues and accomplishments while incarcerated as mitigators. See App. p. 89. The trial court also refused to consider a risk assessment tool because it was not available under the previous sentencing scheme and reflected Taylor's criminal history, which the trial court had already considered. Without more, Taylor has not established that the trial court erroneously considered the mitigators in this case.

12

testimony.  The manner in which the jury was instructed does not amount to fundamental error.  Finally, Taylor did not establish that his sixty-five-year sentence is inappropriate.  We affirm.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.